FILED
2022 Feb-09  AM 09:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MARC KAPSALIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Case No.: _____** |
| ) | |
| **DEAN SICKING,** ) | **\*\*\*JURY TRIAL DEMANDED\*\*\*** |
| ) | |
| **Defendant.** ) | |
| ) | |

## COMPLAINT

Marc Kapsalis ("Kapsalis" or "Plaintiff") files the following Complaint (the "Complaint") against Dr. Dean Sicking ("Dr. Sicking") ("Defendant"), stating as follows:

### <u>INTRODUCTION</u>

1.     Marc Kapsalis is devoted to making hockey safer. For the past twelve years, he has focused his efforts on improving the barrier around hockey rinks—called the "dasher board" (also called "the wall")—to protect hockey players from collisions that can injure them seriously and permanently. In pursuit of safer dasher boards, Kapsalis enlisted the help of Dr. Dean Sicking, a mechanical engineer experienced in developing energy-absorbing barriers for automotive racetracks.

2.    But Dr. Sicking has been less than helpful. His delays, excuses, misrepresentations, and broken promises have only sapped Kapsalis's resources and diverted time and energy away from the goal of the project: making hockey players safer from collisions into the wall. Dr. Sicking has pursued his own ends and, in the process, attempted to string Kapsalis along while keeping him in the dark about what—and whether—progress has been made on the project.

3.    Through empty promises and studious omissions of facts, Dr. Sicking induced Kapsalis into unfavorable "joint" business arrangements related to a safer hockey helmet and led Kapsalis to quit his job and to forego third-party funding opportunities for the project. With Kapsalis then financially dependent on the project, Dr. Sicking delayed development to create opportunities to scam Kapsalis out of his idea and the intellectual property associated with it. Dr. Sicking's conduct toward Kapsalis could not be clearer: to take control of the dasher board project and squeeze Kapsalis out of his ownership of the associated intellectual property.

4.    Through this civil action, Kapsalis seeks to proceed with the development of safer dasher boards; to clarify his rights in the intellectual property associated with the project; to restore some of the resources that he has lost due to Dr. Sicking's broken promises and even outright fraud; and ultimately, to make hockey safer by helping bring dasher boards to hockey rinks around the world.

## NATURE OF THIS ACTION

5.    This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; the United States Patent Act, 35 U.S.C. § 1 *et seq.*; and the civil laws of at least the State of Alabama.

## PARTIES

6.    Plaintiff Kapsalis is an individual residing in the State of Illinois.

7.    On information and belief, Defendant Dr. Sicking is an individual residing in the State of Alabama.

## JURISDICTION AND VENUE

8.    This Court has original subject-matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338, because this Complaint states claims arising under federal law, including claims related to the Patent Act, 35 U.S.C. § 1 *et seq.* This Court has supplemental jurisdiction over Kapsalis's state-law claims presented herein under 28 U.S.C. § 1367, because such claims are part of the same case or controversy as Kapsalis's federal-law claims. In addition and to the extent necessary, this Court has original subject-matter jurisdiction over the state-law claims presented herein under 28 U.S.C. § 1332, because there is complete diversity between the parties and the amount in controversy for Kapsalis's state-law claims, exclusive of interest and costs, exceeds $75,000.

9.      Complete diversity exists between the parties because Kapsalis is a citizen of Illinois while Dr. Sicking is a citizen of Alabama.

10.     Defendant Dr. Sicking is a resident of the State of Alabama; resides in this District; and has committed tortious acts within this District. Therefore this Court has personal jurisdiction over Dr. Sicking.

11.     Venue is also proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper in this District under 28 U.S.C. § 1391(b)(1), (c)(2), because sole Defendant Dr. Sicking is a natural person who is domiciled in—and who therefore resides in—this District.

12.     Venue is proper in the Southern Division of this District because Dr. Sicking resides in Shelby County, Alabama.

## GENERAL ALLEGATIONS

### *Plaintiff Kapsalis*

13.     Plaintiff Kapsalis is a 1985 graduate of the United States Military Academy at West Point; a former NCAA Division I hockey player; a former captain of the Army Black Knights hockey team; former Airborne Ranger Infantry officer; and a current youth-hockey coach.

14.     For the past twelve years, the development of safer dasher-board assemblies has been the passion and focus of Kapsalis's life.

15.    The dasher boards form the wall around a hockey rink.

16.    Inspired by personal experiences with the devastating head injuries that head-first crashes into the boards can cause, Kapsalis began in 2010 to research the issues and to work towards a solution.

### *Defendant Dr. Sicking*

17.    Defendant Dr. Sicking is nationally known for his work developing the Steel and Foam Energy Reduction Barrier ("SAFER Barrier")—a "soft wall" found on automotive racetracks to protect drivers during crashes. Crash cushions and guardrails developed by Dr. Sicking have been adopted by racetracks around the world.

18.    Currently, Dr. Sicking is the Associate Vice President for Product Development at the University of Alabama at Birmingham's ("UAB") School of Engineering. On information and belief, Dr. Sicking has been employed by UAB since November 2012.

### *Kapsalis Works with RPI*

19.    Kapsalis began his efforts to develop a safer dasher-board assembly (referred to herein as the "Dasher Board Project") in 2010.

20.    Before approaching Dr. Sicking, Kapsalis initially worked in partnership with researchers at Rensselaer Polytechnic Institute ("RPI") in Troy, New York.

21.    In this early work, Kapsalis contributed by conceiving multiple avenues for investigation, design, and development.

22.    Kapsalis successfully obtained multiple patents related to his early work with RPI, including U.S. Patent Nos. 8,696,478 and 10,029,168. Kapsalis is the sole owner of those patents.

### *Kapsalis's Initial Agreement with Dr. Sicking in 2011*

23.    In 2011, Kapsalis reached out to Dr. Sicking as a potential consultant for the Dasher Board Project due to Dr. Sicking's reputation as an authority on the development and implementation of energy-absorbing products, including the SAFER Barrier.

24.    At that time, Dr. Sicking was employed with the University of Nebraska-Lincoln.

25.    Kapsalis and Dr. Sicking executed a first agreement concerning the Dasher Board Project on August 30, 2011 (the "Initial Agreement"). The Initial Agreement is attached as Exhibit A.

26.    The Initial Agreement is a one-page, handwritten agreement providing: (a) that Dr. Sicking (and his students) would be responsible for engineering for the Dasher Board Project in exchange for "20% of Revenue Royalties"; and (b) that Kapsalis would cover all out-of-pocket expenses, including expenses related to testing. Ex. A.

27.    The Initial Agreement expressly compensates Dr. Sicking with "20% of Revenue Royalties," recognizing Kapsalis's ownership both: (1) of the intellectual property that had already been developed with RPI; and (2) of intellectual property to be developed in connection with the Dasher Board Project (this latter the "Dasher-Board IP"). *See* Ex. A.

28.    For the avoidance of doubt, in this Complaint, the term "Dasher-Board IP" includes at least all ideas, processes, inventions, works of authorship, technology, designs, formulas, discoveries, devices, symbols, marks, methods (of doing business or otherwise), and all subject matter that may be protectible by patent, copyright, trade secret, trademarks, or by any other proprietary rights, along with all applications, registrations, government grants, and rights to the same, and all improvements, continuations (of any form), rights, and claims related to any of the foregoing, that are created, authored, made, invented, discovered, conceived, developed, or reduced to practice by Kapsalis and/or Dr. Sicking, either alone or with others, that relate to the Dasher Board Project, to dasher-board assemblies, to a dasher-board product, or to any inventions incident to a dasher-board product. Without limiting the generality of the foregoing, the term "Dasher-Board IP" also includes information regarding manufacturers or potential manufacturers related to the Dasher Board Project.

29.    At or around the time that the Initial Agreement was executed, Dr. Sicking told Kapsalis that he anticipated the Dasher Board Project would require about $40,000 in costs.

30.    Kapsalis promptly raised $30,000 from investors—close friends and former hockey teammates—to defray the majority of these costs.

31.    Upon learning of this, Dr. Sicking told Kapsalis to stop seeking investors and volunteered without condition to fund whatever additional out-of-pocket costs were required. Kapsalis complied with Dr. Sicking's demand.

32.    In an email exchange in September 2011 (the "September 2011 Emails"), Dr. Sicking and Kapsalis provided additional detail about the terms of the Initial Agreement.

33.    Specifically, they discussed that all engineering of the safer dasher-board system would be done by Dr. Sicking and his students and that, in exchange for their efforts, Dr. Sicking and "students of his choice" would "receive 20% (or lower % if [Dr. Sicking] chooses) of any payments and royalties received from the sale of the final product." Ex. B.

34.    The September 2011 Emails also memorialized that Kapsalis would "pay for all testing and other out of pocket expenses," for which expenses Dr. Sicking provided estimates (totaling less than his previous estimate of $40,000). Ex. B.

### *Kapsalis Forms ZiKap for the Dasher Board Project*

35.    To facilitate the Dasher Board Project, Kapsalis formed a corporate entity ("ZiKap", an Illinois business entity) during his early discussions with Dr. Sicking.

36.    Kapsalis intended to utilize ZiKap to facilitate various aspects of the Dasher Board Project, including borrowing money, seeking third-party funding, and other business operations.

37.    Kapsalis and Dr. Sicking understood at the time of the Initial Agreement that Kapsalis might choose to assign the Dasher-Board IP to ZiKap.

38.    Kapsalis did not assign any of the Dasher-Board IP to ZiKap. ZiKap was dissolved on January 10, 2020.

### *Dr. Sicking Proposes a Joint Venture*

39.    Shortly after entering the Initial Agreement that provided to Kapsalis all ownership of the Dasher-Board IP, Dr. Sicking began his pattern of empty promises, delays, and goose-chases to defraud Kapsalis of rights to the Dasher-Board IP.

40.    In particular, Dr. Sicking approached Kapsalis with a proposal to add to their work the development of a safer hockey helmet. In this Complaint, the term "Helmet Project" refers to (ultimately illusory) aspects of their work related to the development of a safer hockey helmet.

41.     As explained in more detail below (at ¶¶ 47–58), the Helmet Project proposal was a fraudulent ruse and a stalling tactic by Dr. Sicking both: (1) to induce Kapsalis to change his position from that recognized in the Initial Agreement; and (2) in the meantime, to deflect Kapsalis's attention from the lack of progress on the Dasher Board Project. Dr. Sicking never intended to do any work on the Helmet Project. In fact, Dr. Sicking knew at the time he proposed the development of a safer hockey helmet to Kapsalis that he would not be able to work on the Helmet Project.

42.     Based on Dr. Sicking's proposal, the parties altered their respective responsibilities and interests in the Dasher Board Project.

43.     In a December 6, 2011, email summarizing the new arrangement (the "JV Summary"), Kapsalis confirmed with Dr. Sicking:

(a)     that Dr. Sicking would "design and write patents on a new Hockey Dasher board and hockey helmet";

(b)     that Dr. Sicking and Kapsalis would be "50/50 partners in ZiKap, Inc.";

(c)     that they would "share equally in all expenses and revenues";

(d)     that Dr. Sicking would "pay the first $30k of expenses the company incurs on the prototypes and patents," which would make them "equally financially vested";

(e)     that Dr. Sicking would "be the inventor and assignee on all patents";

(f)     that ZiKap would "have sole, exclusive, complete and indefinite full rights to the use[] of all of the IP and all patents that [Dr. Sicking] designs and submits to the USPTO" pertaining to "any and all Dasher board designs and any and all hockey helmet designs"; and

(g)     that these exclusive rights would "not include the rights to any use of the IP or additional patents on designs that fall outside of hockey."

44.     Kapsalis agreed to change his position with respect to the Dasher-Board IP for the chance to also profit from the Helmet Project because Kapsalis believed that Dr. Sicking had the ability—and would make a good faith effort—to bring both products to market. As detailed below, Dr. Sicking's promises about the Helmet Project were fraudulent and intentionally misled Kapsalis into the joint-venture arrangement.

45.     In the JV Summary, Kapsalis asked Dr. Sicking to "[p]lease send me an email that you [are] in agreement with the below, or send a note about anything you are uncomfortable with and the suggested wording."

46.     Dr. Sicking did not respond to the JV Summary or otherwise contest any of the terms that Kapsalis had summarized. Dr. Sicking also ignored Kapsalis's later-repeated requests for any objections to the JV Summary: on

December 16, 2011; on December 23, 2011; on January 6, 2012; and on February 2, 2012.

### *Dr. Sicking Conceals the Terms of His Employment by UAB*

47.     During his early discussions with Kapsalis in 2011 and 2012, Dr. Sicking was also in employment discussions with UAB.

48.     Specifically, during the time that Dr. Sicking was proposing the Helmet Project and joint venture to Kapsalis in 2011 and 2012, Dr. Sicking was involved in ongoing negotiations with UAB—negotiations leading to terms that would restrict Dr. Sicking's freedom to advance the Helmet Project on the terms that he had represented to Kapsalis.

49.     Dr. Sicking executed an employment agreement with UAB dated May 24, 2012 (the "UAB Offer Letter"), to become the "Associate Vice President for Commercialization and Product Development," a principal goal of which concerned "mov[ing] an array of research concepts to commercial products."

50.     The UAB Offer Letter emphasized that product development would be a key part of Dr. Sicking's job at UAB:

> Dean, we are very excited about your passion for *product development* and your vision to broaden your unique and innovative contributions for the design and development of road-side safety barriers applicable to motorsports and general transportation to a broader array of innovations.

UAB Offer Letter at 1 (emphasis in original).

51.    The UAB Offer Letter also disclosed to Dr. Sicking details about his interest in intellectual property:

> The inventor portion of Intellectual Property distribution will be 45% for all distributed revenue income net of patent reimbursements and UAB Research Foundation Expenses.

*Id.* at 2.

52.    The UAB Offer Letter also instructed Dr. Sicking to "refer to the UAB Faculty Handbook for information regarding UAB policies and procedures related to faculty, including promotion and tenure guidelines." *Id.* at 3.

53.    Those policies included UAB's Patent Policy, which provided:

> Any invention or discovery (1) which is the result of research carried on by or under the direction of an employee of a campus of the University and/or having the costs thereof paid from funds provided by, under the control of or administered by a campus of the University, or (2) which is made by an employee of a campus of the University and which relates to the employee's field of work, or (3) which has been developed in whole or in part by the utilization of resources or facilities belonging to a campus of the University, shall be the property of the applicable campus of the University.

UA Board of Trustees Rule 509(II)(D) (UAB Patent Policy).[1]

54.    Further, section 509(II)(E) makes clear that the policy is a condition of employment at UAB and provides further:

---

[1] This citation is to the version of UAB's Patent Policy available in 2019, which at that time was last amended in 2013. Upon information and belief, either it or a materially similar version of it was in place in 2012, when Sicking signed the UAB Offer Letter.

> All inventions and discoveries that meet the criteria of II.D. are hereby assigned to the University for the benefit of the appropriate campus of the University. Faculty members, employees and students do not have the authority to assign rights in such inventions and discoveries to third parties.

UAB Patent Policy at § (II)(E).

55.    In fact, **from 2013 to the present**, Dr. Sicking was named as an inventor on multiple patent applications that related to improved helmet technologies **and were assigned to the UAB Research Foundation**. *See*, *e.g.*, U.S. Patent No. 10,115,200 (entitled "Systems and Methods for Analyzing Sports Impacts"; filed in 2013 and issued in 2018); U.S. Patent No. 10,444,099 (entitled "Systems and Methods for Testing Protective Helmets"; filed in 2013 and issued in 2019); U.S. Patent No. 10,568,377 (entitled "Protective Helmet Systems that Enable the Helmet to Rotate Independent of the Head"; filed in 2015 and issued in 2020); U.S. Patent No. 10,729,200 (entitled "Protective Helmets Having Energy Absorbing Tethers"; filed in 2014 and issued in 2020); U.S. Patent No. 10,779,600 (entitled "Protective Helmets Having Energy Absorbing Shells"; filed in 2014 and issued in 2020); U.S. Patent Application Publication No. 2017/0303623 A1 (entitled "Protective Helmets Having Energy Absorbing Liners"; filed in 2014 and still pending).

56.    Dr. Sicking knew but failed to disclose to Kapsalis the full scope of the terms of his new position at UAB, much less that the terms of his employment

and work there flatly prohibited Dr. Sicking from partnering with Kapsalis to develop a safer hockey helmet in the manner proposed by Dr. Sicking.

57.    Further, in a meeting during 2012, Dr. Sicking affirmatively misrepresented to Kapsalis that his position at UAB posed no threat to the Helmet Project.

58.    Kapsalis, standing with Dr. Sicking in the driveway of the latter's new Alabama home, directly asked Dr. Sicking whether his new job at UAB could impact ownership of intellectual property associated with the Helmet Project. Dr. Sicking responded unequivocally that UAB would have no claim to any intellectual property developed in connection with the Helmet Project because Dr. Sicking had begun working on the project before joining UAB. Kapsalis— trusting in Dr. Sicking's long experience as an inventor (and knowledge of his own employment relationship with UAB)—relied on Dr. Sicking's affirmative misrepresentations. Kapsalis left that meeting with the understanding that the terms of the UAB position would not negatively impact their work on the Helmet Project.

### _The 2015 Document Purports to Memorialize the Terms of the Joint Venture_

59.    Later—even though Dr. Sicking had been employed by UAB for years on restrictive terms never disclosed to Kapsalis—the parties memorialized the terms of the proposed joint venture—including both the Dasher Board Project

and the Helmet Project—in June 2015 in what they called a "Binding Agreement Between Parties" (the "2015 Document" attached as Exhibit B).

60.    As explained in more detail above (at ¶¶ 47–58), many of the terms reflected in the JV Summary and/or the 2015 Document were fraudulently induced by Dr. Sicking.

61.    Other terms reflected representations that Dr. Sicking was making to Kapsalis around this time. Among other things, the 2015 Document noted that Dr. Sicking and Kapsalis had agreed to "Reasonable pursuit of marketable Wall" **by December 2015**. Ex. B.

62.    The 2015 Document also noted the addition of the "development of an energy absorbing hocket [sic] helmet"—*i.e.* the Helmet Project—to their work, with a marketable helmet to be accomplished **by December 2016**. Ex. B. (Those two deadlines—December 2015 for the Dasher Board Project, and December 2016 for the Helmet Project—are referred to herein as the "JV Deadlines.")

63.    The JV Deadlines were chosen by Dr. Sicking. Kapsalis relied on Dr. Sicking's experience and expertise in choosing dates that would be reasonably achievable.

64.    As it pertains to intellectual property, the 2015 Document noted that the parties were to

> share equally in the costs of applying, maintaining, defending and pursuing all matters related to these patents and their related IP as well

as future patents and IP related to the helmet and/or wall (Both parties have existing patents and Intellectual Property (IP) related to the wall.).

Ex. B.

65.     The 2015 Document also noted that the parties agreed "[t]o jointly control and mutually agree upon the use of any and all IP related to the wall or the helmet" and "[t]o mutually agree upon any patent or IP sub-licensing to any manufacturer, including but not limited to the terms of the use and the business agreements or contracts." Ex. B.

66.     The 2015 Document also noted that Dr. Sicking and Kapsalis had agreed to split all monies received as a result of sales of the wall or helmet 50/50. Ex. B.

67.     Finally, the 2015 Document noted that:

[c]ontinued discussion and mutual agreement is required on topics such as[] the term of this agreement as relates to the IP and patents, termination of this agreement, the territory, the selling price, reports and Audits, assignment, insurance and indemnification, buyouts and valuations, notice, first right of refusal, etc.

Ex. B.

68.     Had Kapsalis known about the terms of Dr. Sicking's employment with UAB, he would not have agreed to the 2015 Document.

### *Dr. Sicking Misses the JV Deadlines and Misrepresents the Projects' Status*

69.    From 2012 to 2015, Dr. Sicking and Kapsalis developed and tested prototypes for a new dasher-board system.

70.    During this time, Dr. Sicking worked sporadically on the Dasher Board Project. This work included contracted design-input, prototype-building, and prototype-testing by Becker Arena Products ("Becker") and preliminary design work. Kapsalis and Dr. Sicking first met with Becker on June 10, 2013. The following day, Kapsalis and Dr. Sicking met with Sport Systems Canada in Toronto, Ontario, to discuss potential engagement for testing and marketing.

71.    Dr. Sicking's representations at that time that the project was nearing completion led to contract-negotiations with Becker for manufacturing the final dasher board product.

72.    And, true to form, the Dasher Board Project was several times delayed by Dr. Sicking's unresponsiveness—which included an extended period lasting from November 9, 2014, through January 19, 2015, during which Dr. Sicking stopped responding to Kapsalis's calls, emails, and text messages requesting updates and progress reports.

73.    During this time, from 2012 to 2015, Dr. Sicking did no work at all on the Helmet Project. Kapsalis made numerous requests for drawings or status

updates. Dr. Sicking consistently ignored the requests or responded with empty promises.

74.    Eventually, Dr. Sicking and one of his students received a U.S. patent on a design for a dasher board. Specifically, U.S. Patent No. 9,091,091 (the " '091 Patent) issued on July 28, 2015, and is attached as Exhibit C.

75.    However, despite continued promises of progress and benchmarks from Dr. Sicking, the JV Deadlines for marketable products—December 2015 for the dasher-board assembly, and December 2016 for the improved hockey helmet—came and went.

### *Kapsalis Acts on Dr. Sicking's Misrepresentations and Is Thereby Damaged*

76.    Kapsalis made significant business and career decisions based on the representations made to him by Dr. Sicking about the Dasher Board Project and the Helmet Project.

77.    For example, in 2012 Kapsalis stopped soliciting investment funds for the Dasher Board Project and the Helmet Project at the instruction of Dr. Sicking—who did not want to share with others what he viewed as a tremendous upside.

78.    Further, in October 2015 Kapsalis walked away from his jobs at Illinois Elite Hockey, Inc., and Team Illinois Spring and Summer, Inc.—thereby foregoing hundreds of thousands of dollars in compensation over the next several

years—to focus all of his time and energy on the Dasher Board Project, which Dr. Sicking had led him to believe was soon to produce a marketable product.

### *Dr. Sicking Purchases ZiKap Stock in 2016 and 2017*

79.    When Dr. Sicking failed to meet the JV Deadlines, he quite literally agreed to "buy time."

80.    Specifically, in early 2016 Dr. Sicking agreed to pay Kapsalis a salary of $180,000 for one year, in monthly installments of $15,000 each. At the same time, Dr. Sicking also agreed to purchase from Kapsalis an additional $90,000 of equity in ZiKap. Later, in 2017, Kapsalis continued to offer that Dr. Sicking could purchase $15,000 of ZiKap stock from Kapsalis each month until "the dasher [is] at the point that it is a proven concept."

81.    Dr. Sicking's representation led Kapsalis to believe that three additional months were all that was needed to produce a marketable dasher-board assembly. The stock purchases were understood by Kapsalis and Dr. Sicking to serve as replacement income for Kapsalis since he had left other employment based on Dr. Sicking's representations as to the status of the Dasher Board Project. The stock purchases signaled to Kapsalis that Dr. Sicking intended to complete the Dasher Board Project.

82.    But Dr. Sicking's continued delays and repeated misrepresentations resulted in this three-month arrangement being ***repeated multiple times***— ultimately carrying over into 2017.

83.    Through these stock purchases—necessitated by Dr. Sicking's delays and by Kapsalis's financial reliance on Dr. Sicking's fraudulent inducements— Dr. Sicking slowly chipped away at Kapsalis's ownership and control of the Dasher Board Project.

84.    In connection with these stock purchases, Dr. Sicking agreed to a valuation of the Dasher Board Project and the Helmet Project of $8,000,000.

85.    In 2017 the parties' relationship deteriorated further as Dr. Sicking continued his pattern of delay and eventually stopped submitting the monthly payments to Kapsalis.

86.    The payments due in July and August 2017 were short—only $8,000 and $12,000 respectively.

87.    Eventually, the parties engaged a mediator in Chicago to help resolve their differences and to move the Dasher Board Project forward.

88.    Following mediation, which took place in September 2017, Dr. Sicking agreed to continue to buy ZiKap stock from Kapsalis in October, November, and December 2017 at a rate of $12,000 per month.

89.     Kapsalis left the mediation believing that they would have a product to market by the end of 2017 (***two years later*** than the JV Deadlines that Sicking had promised, but a product to market nonetheless).

### *Dr. Sicking Buys Additional Time in 2018*

90.     When 2018 rolled around without further progress, Dr. Sicking agreed to loan Kapsalis money to buy additional time.

91.     Specifically, in January 2018 Dr. Sicking agreed to loan Kapsalis $6,000 per month for three to six months.

92.     Dr. Sicking ultimately provided six monthly payments to Kapsalis of $6,000 each.

### *Dr. Sicking Misrepresents the Projects' Status Through 2017 and 2018*

93.     During this time and into 2018, Dr. Sicking continued to mislead Kapsalis to believe that design and development of a viable and marketable dasher-board system were right around the corner.

94.     In April 2017 Dr. Sicking reported to Kapsalis:

The new SAFIR Dasher design has been shown to be capable of reducing peak compressive forces in the neck to 4000 N or less for speeds approaching 12 mph. This represents a major reduction in the compressive forces associated with a head first impact against with the board. Further, the design has been refined to extend the available movement of the board contact plate which should further increase the speeds at which the peak compressive forces can be kept at or below 4 kN. Peak neck forces will be significantly reduced for higher speed impacts with the board, even when the maximum exceeds 4 kN.

95.    A presentation about the project was prepared later in 2017, based in part on Dr. Sicking's reports. This presentation was prepared to show potential investors after Dr. Sicking—who had told Kapsalis in 2011 to stop seeking investors—now told Kapsalis in 2017 that investors would be needed to fund design and development of a safer hockey helmet, which, unbeknownst to Kapsalis, Dr. Sicking had not yet started. In fact, Kapsalis never presented the prepared presentation, because he never received the promised sketches from Dr. Sicking.

96.    Dr. Sicking also reported to Kapsalis, in October 2018, that he was "satisfied that the current wall design will materially reduce the risk of burst fracture of the cervical vertebrae" and that they "now need[ed] to work with [their] partners to determine if they think The [sic] design is marketable as is."

97.    Dr. Sicking also occasionally made vague (and empty) promises to Kapsalis about his work on the Helmet Project.

98.    For example, in response to an inquiry from Kapsalis about some drawings that Dr. Sicking was to prepare for the helmet design, Dr. Sicking responded by email on September 4, 2018, that he had "been working drawings for the helmet concept" but "[u]nfortunately, the drawings have taken some time to implement. Will get them to you soon."

99.    On September 18, 2018, in response to another inquiry from Kapsalis, Dr. Sicking reported that "helmet sketches are lagging."

100.    Over a period of many months, Kapsalis repeatedly requested copies of the drawings.

101.    To this date Kapsalis has yet to receive drawings or sketches for the Helmet Project from Dr. Sicking. In fact, to this very day, Kapsalis has never seen anything to suggest that Dr. Sicking had "been working drawings for the" Helmet Project at all.

### *Kapsalis Files Suit in 2019*

102.    After this litany of failed promises and frustrations, Kapsalis filed a civil action against Dr. Sicking in Illinois state court in January 2019, asserting claims against Dr. Sicking for breach of contract and fraud.

103.    Dr. Sicking removed the case to federal court and transferred it here, and, in May 2019, he filed an Answer and Counterclaim.

104.    The parties thereafter agreed to dismiss their claims without prejudice and entered a tolling agreement.

105.    Since that time, mediation has been unsuccessful.

106.    Dr. Sicking gave notice of termination of the tolling agreement on January 12, 2022, which, under the terms of the agreement, terminates the Tolling Period on February 16, 2022.

### *Intellectual-Property Assets Related to Dasher-Board Assemblies*

107.   Though progress elsewhere has been sorely lacking, Dr. Sicking has continued to prosecute patent applications related to dasher-board systems, both in the United States and in Canada.

108.   For example, U.S. Patent No. 10,507,377 (the " '377 Patent" attached as Exhibit D) issued to Dr. Sicking on December 17, 2019, and relates to alternative designs for dasher-board systems.

109.   Dr. Sicking is also continuing to prosecute U.S. Patent Application Serial No. 16/715,810 (the "Continuation Application"), which is a continuation of the application that issued as the '377 Patent.

110.   Dr. Sicking also has one Canadian patent and one Canadian patent application pending.

111.   Kapsalis is not identified as an inventor on at least the following patents and pending applications of Dr. Sicking that relate to dasher-board systems:

(a)    U.S. Patent Application Serial Number 16/715,810 titled "Sports Wall Assembly" and filed on December 16, 2019 (*i.e.*, the Continuation Application);

(b)    U.S. Patent Number 9,091,091 titled "Energy Absorbing Sports Board Assembly" and issued on July 28, 2015 (*i.e.*, the '091 Patent);

(c)     U.S. Patent Number 10,507,377 titled "Sports Wall Assembly" and issued on December 17, 2019 (*i.e.*, the '377 Patent);

(d)     Canadian Patent Number 2917881 titled "Energy Absorbing Sports Board Assembly" and issued on January 11, 2022; and

(e)     Canadian Patent Application Number 3003364 titled "Sports Wall Assembly" and filed on May 01, 2018.

112.   Kapsalis has also continued to prosecute patent applications related to dasher-board systems, both in the United States and in Canada. Dr. Sicking's delays and secrecy necessitated that Kapsalis attempt to move the Dasher Board Project forward on his own because Dr. Sicking was not cooperating.

113.   For example, U.S. Patent No. 10,279,244 (the " '244 Patent") issued to Kapsalis on May 07, 2019, and relates to a design for a dasher-board system.

114.   Kapsalis also prosecuted two U.S. patent applications that were continuations of the application that issued as the '244 Patent. Those two applications were granted as U.S. Patent Nos. 10,596,448 and 11,202,957, which issued on March 24, 2020, and on December 21, 2021, respectively.

115.   Finally, Kapsalis has obtained a Canadian Patent No. 2976105 on a dasher-board system.

## COUNT I

### Declaratory Judgment Regarding
### Kapsalis's Ownership of the Dasher-Board IP

116.   Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

117.   There is an actual and justiciable controversy between the parties— arising under the Patent Act, 35 U.S.C. § 1, *et seq.*—concerning Kapsalis's ownership of the Dasher-Board IP.

118.   At all times before execution of the Initial Agreement, Kapsalis had all rights, title, and interest in and to the Dasher-Board IP then existing.

119.   The Initial Agreement did not affect and therefore Kapsalis retained exclusive ownership of all right, title, and interest in and to the Dasher-Board IP, subject only to the royalty interest provided to Dr. Sicking.

120.   The Initial Agreement does not grant to Dr. Sicking any ownership of the Dasher-Board IP. It only grants Dr. Sicking a portion of "[r]oyalties."

121.   No valid agreement has ever lessened Kapsalis's ownership.

122.   Kapsalis therefore owns full right, title, and interest in and to the Dasher-Board IP, subject only to the royalty interest provided to Dr. Sicking.

123.   Kapsalis has not assigned to Dr. Sicking any right, title, or interest in or to the Dasher-Board IP apart from the royalty interest reflected in the Initial Agreement.

WHEREFORE, Kapsalis prays that this Court:

(a)    declare Kapsalis the exclusive owner of the Dasher-Board IP;

(b)    declare Kapsalis the holder of all right, title, and interest in and to the Dasher-Board IP subject only to the interest of Dr. Sicking reflected in the Initial Agreement;

(c)    award Kapsalis all costs; and

(d)    award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT II

### Reformation for Mutual Mistake

124.   Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein and pleads Count II in the alternative to Count I.

125.   At the time of the Initial Agreement, both Kapsalis and Dr. Sicking knew that the Dasher-Board IP would be important.

126.   At the time of the Initial Agreement, Kapsalis and Dr. Sicking reached a mutual understanding that Kapsalis was and would continue to be the exclusive owner of the Dasher-Board IP.

127.   At the time of the Initial Agreement, Kapsalis and Dr. Sicking contemplated continuing to interact with each other in the development of the Dasher-Board IP.

128.   Kapsalis and Dr. Sicking made the mutual mistake of omitting from the handwritten document memorializing the terms of their agreement their mutual understanding that Kapsalis would own the Dasher-Board IP.

WHEREFORE, in the alternative to Count I, Kapsalis prays that this Court:

(a)    reform the Initial Agreement to reflect the mutual understanding of Kapsalis and Dr. Sicking that Kapsalis was and would continue to be the exclusive owner of the Dasher-Board IP;

(b)    reform the Initial Agreement to reflect the mutual understanding of Kapsalis and Dr. Sicking that Kapsalis was and would continue to be the holder of all right, title, and interest in and to the Dasher-Board IP subject only to the interest provided to Dr. Sicking in the Initial Agreement;

(c)    award Kapsalis all costs; and

(d)    award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT III

**Declaratory Judgment Regarding
Kapsalis's Inventorship and Ownership of the '377 Patent**

129.    Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

130.    There is an actual and justiciable controversy between the parties—arising under the Patent Act, 35 U.S.C. § 1, *et seq.*—concerning Kapsalis's inventorship and ownership of the '377 Patent.

131.    Kapsalis is an inventor of the invention claimed in the '377 Patent.

132.    Kapsalis contributed to the conception and reduction to practice of the invention claimed in the '377 Patent.

133.    Kapsalis is a joint inventor with Dr. Sicking of the invention claimed in the '377 Patent.

134.    Through error, Kapsalis is an inventor not named in the '377 Patent.

135.    Under 35 U.S.C. § 256, the Director of the U.S. Patent and Trademark Office (the "USPTO") may issue a certificate correcting such error.

136.    Under 35 U.S.C. § 256, this Court may order correction of the '377 Patent and the Director of the USPTO shall issue a certificate accordingly.

30

137.    Kapsalis has not assigned to Dr. Sicking or to any other person or entity any right, title, or interest in or to the '377 Patent that he holds as a co-inventor.

138.    Kapsalis is therefore at least a joint owner of the '377 Patent.

139.    Kapsalis may make, have made, use, offer to sell, sell, reduce to practice, commercialize, or otherwise practice the invention claimed in the '377 Patent within the United States, or import the invention claimed in the '377 Patent into the United States, without the consent of and without accounting to any other inventors or alleged owners of the '377 Patent.

140.    Neither the Initial Agreement nor any other valid agreement is to the contrary.

WHEREFORE, Kapsalis prays that this Court:

(a)    declare that Kapsalis is a joint inventor of the invention claimed in the '377 Patent;

(b)    order correction of the '377 Patent;

(c)    order the Director of the USPTO accordingly to issue a certificate of correction;

(d)    declare that Kapsalis is at least a joint owner of all right, title, and interest in and to the '377 Patent with the right to practice the invention claimed in the '377 Patent independently of Dr. Sicking;

(e)    award Kapsalis all costs; and

(f)    award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT IV

### Declaratory Judgment Regarding
### Kapsalis's Inventorship and Ownership of the '091 Patent

141.    Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

142.    There is an actual and justiciable controversy between the parties—arising under the Patent Act, 35 U.S.C. § 1, *et seq.*—concerning Kapsalis's inventorship and ownership of the '091 Patent.

143.    Kapsalis is an inventor of the invention claimed in the '091 Patent.

144.    Kapsalis contributed to the conception and reduction to practice of the invention claimed in the '091 Patent.

145.    Kapsalis is a joint inventor with Dr. Sicking of the invention claimed in the '091 Patent.

146.    Through error, Kapsalis is an inventor not named in the '091 Patent.

147.    Under 35 U.S.C. § 256, the Director of the U.S. Patent and Trademark Office (the "USPTO") may issue a certificate correcting such error.

148.    Under 35 U.S.C. § 256, this Court may order correction of the '091 Patent and the Director of the USPTO shall issue a certificate accordingly.

149.    Kapsalis has not assigned to Dr. Sicking or to any other person or entity any right, title, or interest in or to the '091 Patent that he holds as a co-inventor.

150.    Kapsalis is therefore at least a joint owner of the '091 Patent.

151.    Kapsalis may make, have made, use, offer to sell, sell, reduce to practice, commercialize, or otherwise practice the invention claimed in the '091 Patent within the United States, or import the invention claimed in the '091 Patent into the United States, without the consent of and without accounting to any other inventors or alleged owners of the '091 Patent.

152.    Neither the Initial Agreement nor any other valid agreement is to the contrary.

WHEREFORE, Kapsalis prays that this Court:

(a)    declare that Kapsalis is a joint inventor of the invention claimed in the '091 Patent;

(b)    order correction of the '091 Patent;

(c)    order the Director of the USPTO accordingly to issue a certificate of correction;

(d)     declare that Kapsalis is at least a joint owner of all right, title, and interest in and to the '091 Patent with the right to practice the invention claimed in the '091 Patent independently of Dr. Sicking;

(e)     award Kapsalis all costs; and

(f)     award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT V

### Declaratory Judgment Regarding
### Kapsalis's License to the Dasher-Board IP

153.    Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

154.    There is an actual and justiciable controversy between the parties—arising under the Patent Act, 35 U.S.C. § 1, *et seq.*—concerning Kapsalis's license to the Dasher-Board IP.

155.    The Initial Agreement is to the effect that Dr. Sicking has been hired to make a particular invention—*viz.*, a dasher-board product and other inventions incident to a dasher-board product.

156.    The Initial Agreement is to the effect that Dr. Sicking has been hired to give himself to the task of solving a particular problem—*viz.*, developing and

designing a dasher-board product and other inventions incident to a dasher-board product.

157.    Dr. Sicking has developed a dasher-board product and other inventions incident to a dasher-board product.

158.    Dr. Sicking used Kapsalis's money (including the money raised from investors in 2011), time (including multiple trips to Alabama and to other states for discussions and testing), and other material contributions to develop a dasher-board product and other inventions incident to a dasher-board product.

159.    Kapsalis therefore has a proprietary interest in the dasher-board product and the inventions incident to the dasher-board product.

160.    Kapsalis owns at least "shop rights" in the Dasher-Board IP.

161.    Kapsalis owns at least a non-exclusive license to make, use, and otherwise practice the Dasher-Board IP.

162.    Kapsalis has not assigned this interest to any person or entity.

WHEREFORE, in the alternative to the relief prayed for in Counts I and II, Kapsalis prays that this Court:

(a)    declare that Kapsalis is the owner of a non-exclusive license to the Dasher-Board IP with the right to practice the Dasher-Board IP independently of Dr. Sicking;

(b)    award Kapsalis all costs; and

(c)    award Kapsalis such other and further relief as the Court deems just

and equitable.

## COUNT VI

**Declaratory Judgment Regarding**
**Estoppel of Claims Against Kapsalis for Infringement of the Dasher-Board IP**

163.    Kapsalis repeats and incorporates by reference the foregoing

statements and allegations in paragraphs 1–115 of the Complaint as though fully

set forth herein.

164.    There is an actual and justiciable controversy between the parties—

arising under the Patent Act, 35 U.S.C. § 1, *et seq.*—concerning Kapsalis's right to

practice all Dasher-Board IP independently of any rights of Dr. Sicking.

165.    Kapsalis engaged Dr. Sicking to help engineer a safer dasher board in

2011, as reflected in the Initial Agreement, and a relationship has existed between

the two since that time.

166.    The Initial Agreement was executed more than ten (10) years ago.

167.    Dr. Sicking understood that, under the terms of the Initial Agreement,

he was to assist Kapsalis in designing a safer dasher board for hockey rinks.

168.    Dr. Sicking was provided valuable consideration for his work under

the Initial Agreement.

169.  Since execution of the Initial Agreement, Dr. Sicking has obtained patents relating to dasher boards and may continue to obtain patents relating to dasher boards in the future.

170.  Dr. Sicking's conduct following the execution of the Initial Agreement in 2011 is such that Kapsalis has an implied license to practice all Dasher-Board IP.

171.  Specifically, Dr. Sicking has engaged in a course of conduct through which he has refused to share information with Kapsalis about his work on the Dasher Board Project, misrepresented the status of the Dasher Board Project and information about the Dasher Board Project to Kapsalis, and refused to move the Dasher Board Project forward and take an improved dasher board product to market.

172.  Kapsalis reasonably infers from Dr. Sicking's course of conduct that Dr. Sicking does not intend to move the Dasher Board Project forward and that Dr. Sicking does not intend to take an improved dasher board product to market.

173.  Kapsalis reasonably infers from Dr. Sicking's course of conduct that Dr. Sicking does not intend to enforce against Kapsalis any rights that Dr. Sicking might have to the Dasher-Board IP.

174.  Kapsalis has relied and should be entitled to rely on these inferences based on Dr. Sicking's conduct.

175.   Dr. Sicking, through his entire course of conduct, has left Kapsalis with no choice but to take action to move the Dasher Board Project forward and to bring an improved dasher board product to market.

176.   Kapsalis would be materially prejudiced if Dr. Sicking were allowed to proceed against Kapsalis with a claim of infringement of rights to any of the Dasher-Board IP.

177.   Dr. Sicking is and should be held to be equitably estopped from bringing any infringement claims against Kapsalis should Kapsalis choose to move the Dasher Board Project forward or to take an improved dasher-board product to market and, by doing so, practice any of the Dasher-Board IP.

WHEREFORE, in the alternative to the relief prayed for in Counts I and II, Kapsalis prays that this Court:

(a)    declare that Kapsalis is the owner of a non-exclusive license to the Dasher-Board IP with the right to practice the Dasher-Board IP independently of Dr. Sicking;

(b)    declare that Dr. Sicking is equitably estopped from asserting against Kapsalis any infringement claims related to the Dasher-Board IP or Dasher Board Project;

(c)    award Kapsalis all costs; and

(d)     award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT VII

### Breach of Contract

178.   Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

179.   On August 30, 2011, Kapsalis and Dr. Sicking entered an agreement—*viz.* the Initial Agreement—by mutual assent expressed by a valid offer and acceptance.

180.   At the time of the Initial Agreement, both Kapsalis and Dr. Sicking had legal capacity to enter the Initial Agreement.

181.   Adequate consideration was passed between the parties in entering the Initial Agreement: (a) Dr. Sicking would be responsible for engineering for the Dasher Board Project in exchange for a 20% royalty interest; and (b) Kapsalis would cover out-of-pocket expenses, including expenses related to testing.

182.   Thus, the Initial Agreement is a contract existing between Kapsalis and Dr. Sicking.

183.    Kapsalis initially performed his duties, by being willing to cover all out-of-pocket expenses noted by Dr. Sicking, but was soon prevented from performance by Dr. Sicking's fraud.

184.    But Dr. Sicking, on the other hand, failed to perform his duties. To date, Dr. Sicking has not completed engineering for the Dasher Board Project.

185.    As a direct and proximate cause of Dr. Sicking's failure to perform, Kapsalis has suffered damages.

WHEREFORE, Kapsalis prays that this Court:

(a)    award Kapsalis compensatory damages in an amount to be determined by the trier of fact;

(b)    award Kapsalis pre-judgment and post-judgment interest for any award;

(c)    award Kapsalis all costs; and

(d)    award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT VIII

### Inducement by Suppression of Material Fact
### Ala. Code §§ 6-5-102

186.    Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

40

187.   Dr. Sicking made numerous fraudulent omissions beginning in 2012 and extending at least until late 2018—both (a) concerning the impact of his employment at UAB on his ability to participate in the Helmet Project and (b) concerning the status of the Dasher Board Project and the illusory Helmet Project.

188.   At least as early as 2012, when Kapsalis inquired about it, Dr. Sicking was under a duty to Kapsalis to communicate truthfully about the terms of his employment by UAB and the limitations that such employment placed upon him with respect to the Helmet Project with Kapsalis. Dr. Sicking failed to disclose the following:

(a)    that Dr. Sicking would have responsibility for "product development" at UAB;

(b)    that Dr. Sicking would share with UAB revenue from intellectual property;

(c)    that Dr. Sicking would be contractually bound by UAB's Patent Policy;

(d)    that UAB's Patent Policy would determine Dr. Sicking's rights to develop, patent, license, and profit from inventions;

(e)    that UAB's Patent Policy provides for *automatic assignment* of inventions to UAB in many cases;

(f)    that Dr. Sicking must make annual reports to UAB of his patent matters; and

(g)    the true nature and extent of his work at UAB on improved helmet technologies.

189.    That duty of Dr. Sicking was created at least by Kapsalis's directly asking in 2012 whether the new job at UAB could impact ownership of intellectual property relating to the Helmet Project.

190.    Instead of answering truthfully, Dr. Sicking represented that UAB would have no claim to the intellectual property relating to the Helmet Project.

191.    In so answering, Dr. Sicking failed to disclose the terms of his employment with UAB and the limitations that such employment placed upon him with respect to Dr. Sicking's ability to participate in the Helmet Project with Kapsalis.

192.    In particular, Dr. Sicking suppressed the material fact that, in truth, the terms of his employment with UAB actually would impact ownership of intellectual property relating to the Helmet Project.

193.    Despite these limitations, Dr. Sicking continued to suppress material facts even after the execution of the 2015 Document, as he continued to perpetuate the ruse that he was engaged in working on the Helmet Project.

194.   Following execution of the 2015 Document and continuing through 2018, Kapsalis made repeated requests for status updates about the Helmet Project. Instead of answering truthfully about his employment limitations and failure to do any work on the project, Dr. Sicking remained silent or gave empty promises including representations that drawings were "on the way" and would be "coming soon."

195.   For example, on September 4, 2018, in response to an inquiry from Kapsalis about drawings for the Helmet Project, Dr. Sicking emailed that he had "been working drawings for the helmet concept … Will get them to you soon."

196.   In so answering, Dr. Sicking failed to disclose the lagging status of the Helmet Project.

197.   In particular, Dr. Sicking suppressed the material fact that, in truth, he was not working on the Helmet Project at all.

198.   Dr. Sicking's suppression of such facts induced Kapsalis to act, including to make significant business and career decisions, such as resigning from two jobs and decisions related to whether and how he pursued third party funding opportunities.

199.   Kapsalis suffered injury as a proximate consequence of Dr. Sicking's suppression of such material facts.

200.  Kapsalis has suffered significant damages from Dr. Sicking's fraud and deceit including loss in income, contributions of his own time and money, emotional distress, and mental anguish.

WHEREFORE, Kapsalis prays that this Court:

(a)   rescind and render null and void any agreement memorialized in the 2015 Document;

(b)   award Kapsalis compensatory damages and punitive damages, each in an amount to be determined by the trier of fact;

(c)   award Kapsalis pre-judgment and post-judgment interest for any award;

(d)   award Kapsalis all costs; and

(e)   award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT IX

### Inducement by Fraudulent Deceit
### Ala. Code § 6-5-104

201.  Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

202.  Dr. Sicking made numerous fraudulent deceits beginning in 2012 and extending at least until late 2018—both (a) concerning the impact of his

employment at UAB on his ability to participate in the Helmet Project and (b) concerning the status of the Dasher Board Project and the illusory Helmet Project.

203.   Dr. Sicking willfully deceived Kapsalis with the intent to induce him to alter his position to his injury, including by making significant business and career decisions such as resigning from two jobs and decisions related to whether and how he pursued third party funding opportunities. Dr. Sicking intended thereby to create opportunities to defraud Kapsalis of ownership and control of the Dasher-Board IP.

204.   Dr. Sicking suggested and asserted as a fact that the Dasher Board Project was soon to produce a marketable product, which was not true when made and which Dr. Sicking did not even believe to be true when made.

205.   Specifically, On September 18, 2018, Dr. Sicking wrote that he was working on test-data collection for the Helmet Project, which was not true and which Dr. Sicking did not even believe to be true.

206.   Kapsalis has suffered significant damages from Dr. Sicking's fraud and deceit including loss in income, contributions of his own time and money, emotional distress, and mental anguish.

WHEREFORE, Kapsalis prays that this Court:

(a)    rescind and render null and void any agreement memorialized in the 2015 Document;

(b)     award Kapsalis compensatory damages and punitive damages, each in an amount to be determined by the trier of fact;

(c)     award Kapsalis pre-judgment and post-judgment interest for any award;

(d)     award Kapsalis all costs; and

(e)     award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT X

### Inducement by Misrepresentation of Material Facts
### Ala. Code §§ 6-5-101 and -104

207.    Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 and in paragraphs 186–206 (*i.e.*, in Count VIII and Count IX) of the Complaint as though fully set forth herein.

208.    Dr. Sicking made numerous fraudulent misrepresentations beginning in 2012 and extending at least until late 2018—both (a) concerning the impact of his employment at UAB on his ability to participate in the Helmet Project and (b) concerning the status of the Dasher Board Project and the illusory Helmet Project.

209.    At least as early as 2012, when Kapsalis inquired about it, Dr. Sicking was under a duty to Kapsalis to communicate truthfully with Kapsalis about the terms of his employment by UAB and the limitations that employment placed upon

him with respect to the Helmet Project. Dr. Sicking failed to disclose the following:

(a)    that Dr. Sicking would have responsibility for "product development" at UAB;

(b)    that Dr. Sicking would share with UAB revenue from intellectual property;

(c)    that Dr. Sicking would be contractually bound by UAB's Patent Policy;

(d)    that UAB's Patent Policy would determine Dr. Sicking's rights to develop, patent, license, and profit from inventions;

(e)    that UAB's Patent Policy provides for ***automatic assignment*** of inventions to UAB in many cases;

(f)    that Dr. Sicking must make annual reports to UAB of his patent matters; and

(g)    the true nature and extent of his work at UAB on improved helmet technologies

210.    That duty of Dr. Sicking was created at least by Kapsalis's directly asking in 2012 whether the new job at UAB could impact ownership of intellectual property relating to the Helmet Project.

211.   Instead of answering truthfully, Dr. Sicking affirmatively represented that UAB would have no claim to the intellectual property relating to the Helmet Project.

212.   In so answering, Dr. Sicking affirmatively misrepresented material facts about the terms of his employment with UAB and the limitations that employment placed upon him with respect to Dr. Sicking's ability to participate in the Helmet Project with Kapsalis.

213.   In particular, Dr. Sicking misrepresented the material fact that, in truth, the terms of his employment with UAB actually would impact ownership of intellectual property relating to the Helmet Project.

214.   Despite these limitations, Dr. Sicking continued to misrepresent material facts even after the execution of the 2015 Document, as he continued to perpetuate the ruse that he was engaged in working on the Helmet Project.

215.   Following execution of the 2015 Document and continuing through 2018, Kapsalis made repeated requests for status updates about the Helmet Project. Instead of answering truthfully about the status of the Helmet Project, Dr. Sicking made false representations that drawings were "on the way" and would be "coming soon."

216.   For example, on September 4, 2018, in response to an inquiry from Kapsalis about drawings for the Helmet Project, Dr. Sicking emailed that he had "been working drawings for the helmet concept … Will get them to you soon."

217.   In so answering, Dr. Sicking affirmatively misrepresented facts about the lagging status of the Helmet Project.

218.   In particular, Dr. Sicking misrepresented the material fact that, in truth, he had not "been working drawings for the helmet concept."

219.   Dr. Sicking's misrepresentations of such facts induced Kapsalis to act, including to make significant business and career decisions, such as resigning from two jobs and decisions related to whether and how he pursued third party funding opportunities.

220.   Kapsalis suffered injury as a proximate consequence of Dr. Sicking's misrepresentations of such material facts.

221.   Kapsalis has suffered significant damages from Dr. Sicking's fraud and deceit including loss in income, contributions of his own time and money, emotional distress, and mental anguish.

WHEREFORE, Kapsalis prays that this Court:

(a)    rescind and render null and void any agreement memorialized in the 2015 Document;

(b)  award Kapsalis compensatory damages and punitive damages, each in an amount to be determined by the trier of fact;

(c)  award Kapsalis pre-judgment and post-judgment interest for any award;

(d)  award Kapsalis all costs; and

(e)  award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT XI

### Fraudulent Inducement by Promissory Fraud

222.  Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 of the Complaint as though fully set forth herein.

223.  Dr. Sicking made numerous fraudulent misrepresentations and omissions beginning in 2012 and extending at least until late 2018—both (a) concerning the impact of his employment at UAB on his ability to participate in the Helmet Project and (b) concerning the status of the Dasher Board Project.

224.  Dr. Sicking willfully deceived Kapsalis with intent to induce him to alter his position to his injury, including both by executing the 2015 Document and by making significant business and career decisions such as resigning from two

jobs and s decisions related to whether and how he pursued third party funding opportunities.

225.   Dr. Sicking suggested as a fact that the Dasher Board Project was soon to produce a marketable product, which was not true when made and which Dr. Sicking did not believe to be true when made.

226.   Dr. Sicking asserted as a fact that the Dasher Board Project was soon to produce a marketable product, which was not true and for which Dr. Sicking had no reasonable ground for believing it to be true.

227.   Dr. Sicking made promises—including to produce a marketable product, to deliver drawings to Kapsalis, and to deliver test data to Kapsalis.

228.   At the time that Dr. Sicking made such promises, Dr. Sicking intended not to do the acts promised.

229.   At the time that Dr. Sicking made such promises, Dr. Sicking had an intent to deceive Kapsalis, including to deceive Kapsalis by the fraudulent promises.

230.   Kapsalis has suffered significant damages from Dr. Sicking's fraud and deceit including loss in income, contributions of his own time and money, emotional distress, and mental anguish.

WHEREFORE, Kapsalis prays that this Court:

(a)    rescind and render null and void any agreement memorialized in the 2015 Document;

(b)    award Kapsalis compensatory damages and punitive damages, each in an amount to be determined by the trier of fact;

(c)    award Kapsalis pre-judgment and post-judgment interest for any award;

(d)    award Kapsalis all costs; and

(e)    award Kapsalis such other and further relief as the Court deems just and equitable.

## COUNT XII

### Declaratory Judgment Regarding
### Unenforceability of the 2015 Document

231.    Kapsalis repeats and incorporates by reference the foregoing statements and allegations in paragraphs 1–115 and in paragraphs 186–230 (Counts VIII–XI) of the Complaint as though fully set forth herein.

232.    The 2015 Document purported to memorialize an agreement between Kapsalis and Dr. Sicking.

233.    Kapsalis's assent to the 2015 Document was induced and procured by Dr. Sicking's fraud.

WHEREFORE, Kapsalis prays that this Court:

(a)     declare that the 2015 Document and any alleged agreements purportedly memorialized therein are null and void as procured by fraud;

(b)     award Kapsalis all costs; and

(c)     award Kapsalis such other and further relief as the Court deems just and equitable.

## GENERAL PRAYER FOR RELIEF

WHEREFORE, Kapsalis prays this Court will enter judgment against Dr. Sicking and award the following relief:

(a)     to declare Kapsalis to be both:

(1)     the exclusive owner of the Dasher-Board IP; and

(2)     the holder of all right, title, and interest in and to the Dasher-Board IP subject only to the interest of Dr. Sicking reflected in the Initial Agreement;

(b)     in the alternative to prayer for relief (a), to reform the Initial Agreement to reflect the mutual understanding of Kapsalis and Dr. Sicking that Kapsalis was and would continue to be both:

(1) the exclusive owner of the Dasher-Board IP; and

(2) the holder of all right, title, and interest in and to the Dasher-Board

IP subject only to the interest provided to Dr. Sicking in the

Initial Agreement; and

(c)    to declare that Kapsalis is a joint inventor of the invention claimed in

the '377 Patent;

(d)    to order correction of the '377 Patent;

(e)    to order the Director of the USPTO accordingly to issue a certificate

of correction for the '377 Patent;

(f)    in the alternative to prayers for relief (a)–(b), to declare that Kapsalis

is at least a joint owner of all right, title, and interest in and to the '377

Patent with the right to practice the invention claimed in the '377

Patent independently of Dr. Sicking;

(g)    to declare that Kapsalis is a joint inventor of the invention claimed in

the '091 Patent;

(h)    to order correction of the '091 Patent;

(i)    to order the Director of the USPTO accordingly to issue a certificate

of correction for the '091 Patent;

(j)    in the alternative to prayers for relief (a)–(b), to declare that Kapsalis

is at least a joint owner of all right, title, and interest in and to the '091

Patent with the right to practice the invention claimed in the '091 Patent independently of Dr. Sicking;

(k)    in the alternative to prayers for relief (a)–(b), to declare that Kapsalis is the owner of a non-exclusive license to the Dasher-Board IP with the right to practice the Dasher-Board IP independently of Dr. Sicking;

(*l*)    in the alternative to prayers for relief (a), (b), and (k), to declare that Dr. Sicking is equitably estopped from asserting against Kapsalis any infringement claims related to the Dasher-Board IP or Dasher Board Project;

(m)    to rescind and render null and void any agreement memorialized in the 2015 Document;

(n)    to declare that the 2015 Document and any alleged agreements purportedly memorialized therein are null and void as procured by fraud;

(o)    to award Kapsalis compensatory damages in an amount to be determined by the trier of fact;

(p)    to award Kapsalis punitive damages in an amount to be determined by the trier of fact;

(q)     to award Kapsalis pre-judgment and post-judgment interest for any

        award;

(r)     to award Kapsalis all costs; and

(s)     to award Kapsalis such other and further relief as the Court deems just

        and equitable.

## KAPSALIS DEMANDS A TRIAL BY JURY

DATED this 8th day of February, 2022.

Respectfully submitted,

/s/ *Edward S. Sledge IV*
Edward S. Sledge IV (ASB-6239-D60S)
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
esledge@bradley.com

Andrew Tuggle (ASB-1742-X42J)
BRADLEY ARANT BOULT CUMMINGS LLP
200 Clinton Avenue West
Suite 900
Huntsville, Alabama 35801
Telephone: (256) 517-5100
Facsimile: (256) 517-5200
atuggle@bradley.com